UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

JIMMIE E. WILLIAMS,

    Plaintiff,

v.                                      CASE NO. 6:07-cv-1219-Orl-35KRS

BREVARD COUNTY JAIL,
DR. SMITH,[1] DR. TIGHT,[2]

    Defendants.

## ORDER GRANTING SUMMARY JUDGMENT FOR DEFENDANTS

This case is before the Court on the following:

1.     Plaintiff Jimmie E. Williams' Amended Complaint (Doc. No. 7) and Supplement to Amended Complaint (Doc. No. 11),

2.     Defendant Jennifer Tite's Motion for Summary Judgment and Incorporated Memorandum of Law (Doc. No. 57),

3.     Defendant Brevard County Sheriff Jack Parker's Motion for Summary Judgment and Incorporated Memorandum of Law (Doc. No. 58),

4.     Plaintiff Jimmie E. Williams' Reply Brief of Expert Witness (Doc. No. 59),

5.     Plaintiff Jimmie E. Williams' Motion for Summary Judgment (Doc. No. 64),

6.     Defendant Jennifer Tite's Response to Plaintiff's Motion for Summary Judgment (Doc. No. 67), and

---

[1] Defendant Dr. Smith was dismissed from this action on June 2, 2008, for Plaintiff's failure to effectuate service. (Doc. No. 40.)

[2] Plaintiff incorrectly refers to Jennifer Tite as "Dr. Tight." Defendant Tite is a physician's assistant and will be referred throughout as "Tite."

7. Plaintiff Jimmie E. Williams' Memorandum in Support of Motion for Summary Judgment (Doc. No. 70).

## *Factual Background*

Plaintiff, a prisoner in the State of Florida proceeding *pro se*, filed this action against Defendants, Jennifer Tite and Brevard County Sheriff Jack Parker,[3] pursuant to 42 U.S.C. section 1983. At the time of the incidents which give rise to the present action, Plaintiff was incarcerated at the Brevard County Detention Center ("BCDC"). Plaintiff is currently incarcerated at the Tomoka Correctional Institute in Daytona Beach, Florida. Plaintiff alleges that as a result of a previous motor vehicle accident, he is in need of surgeries, medications, and a recovery plan and that while incarcerated at the BCDC, Defendants failed to provide him with this necessary medical care.

Plaintiff was incarcerated at the BCDC on numerous occasions from October 2006, through March 2008. *See* Doc. No. 57-2 at 2. Prior to these incarcerations, Plaintiff was involved in a motor vehicle accident on January 14, 2006. *See* Doc. No. 57-4 at 13-14. As a result of the accident, he sustained multiple injuries including a closed head injury, subarachnoid hemorrhage, bilateral orbital fractures, maxillary fracture, right zygomatic fracture, right radial and ulnar fractures, right femur fracture and right distal tibia fibula

---

[3] Plaintiff named "Brevard County Jail" as a Defendant. However, a jail facility is not recognized by Florida law as a legal entity separate and apart from the sheriff charged with a facility's operation and control. *See Braswell v. Hillsborough County Jail*, 8:08-cv-862-30EAJ, 2008 U.S. Dist. LEXIS 37738 (M.D. Fla. May 8, 2008). The capacity of a governmental corporation to be sued in federal court is governed by the law of the state in which the district court is located. *Dean v. Barber*, 951 F.2d 1210, 1214 (11th Cir. 1992). As such, the Court has construed Plaintiff's claims against the Brevard County Jail to be against the Sheriff of Brevard County, Jack Parker.

fracture. *See* Doc. No. 57-4 at 23. Plaintiff was treated at Holmes Regional Medical Center and was discharged on February 2, 2006. *See* Doc. No. 57-4 at 23-25.

## A.     *Plaintiff's Follow-Up Treatment Prior to Incarceration*

Upon discharge from Holmes Regional Medical Center, Plaintiff received follow-up evaluations from Drs. Timothy O'Hare and Steven Ho. *See* Doc. No. 58-19 at 8-13. Approximately six evaluations took place between February 2006 and October 2006. *Id*. During these follow-up evaluations, Plaintiff often complained of hearing loss and nasal congestion. *Id*. Dr. O'Hare saw Plaintiff on August 8, 2006, and a tube was placed in Plaintiff's right ear to help his hearing. *See* Doc. No. 58-19 at 10. According to Dr. O'Hare's medical notes, Plaintiff "immediately felt like his hearing was better." *Id*. That same day, Dr. O'Hare ordered a CT scan of the maxillofacial skeleton and noted that nasal congestion was secondary to nasal septal deviation. *Id*. He thought that endonasal resection of the turbinates might help with Plaintiff's nasal congestion, allowing him to breath through his nose easier. *Id*.

Plaintiff was seen by Dr. O'Hare on September 12, 2006, at which time Dr. O'Hare recommended consultation with Dr. Ho "to consider a left middle ear exploration and possible ossicular chain reconstruction" to help with the hearing loss in Plaintiff's left ear. *See* Doc. No. 58-19 at 9. On October 12, 2006, Dr. Ho met with Plaintiff and his notes indicate that Plaintiff's ears appeared completely normal, with decreased hearing on the left side most likely caused by "incus dislocation." *See* Doc. No. 58-19 at 8. Dr. Ho suggested that Plaintiff could merely continue observation or could have a middle ear exploration and possible ossicular reconstruction at some convenient time in the future.

*Id*. Plaintiff elected to undergo the treatment procedure at some point in the future; however, Plaintiff was arrested on October 14, 2006, and was booked into the BCDC. *See* Doc. No. 57-2 at 2. Plaintiff was incarcerated at the BCDC for one day on October 14, 2006, and for another day on December 18, 2006. *See* Doc. No. 57-2 at 2. Plaintiff was then incarcerated at the BCDC from January 6, 2007, through October 10, 2007, prior to being transferred to the custody of the Florida Department of Corrections to serve a twenty year sentence. *See* Doc. Nos. 57-2 at 2, 58-20, 58-21, 58-22. Plaintiff was transferred back to the BCDC on January 8, 2008, for resentencing and remained there until March 30, 2008, at which time he was transferred to Tomoka Correctional Institute. *See* Doc. No. 57-2 at 3.

## B. *Incarceration at BCDC from January 6, 2007, through October 10, 2007*

An intake health assessment was completed upon Plaintiff's booking into the BCDC on January 6, 2007. *See* Doc. No. 57-2 at 48-49. At this time, Plaintiff reported a history of asthma and high blood pressure. *Id*. He denied any mental health conditions and also denied any disabilities with regard to his hearing and vision. *Id*. He reported that he was taking medications for pain, asthma, a thyroid condition, and high blood pressure. *Id*. Internal Clinic Referral forms were completed by Armor Correctional Health Services, Inc., personnel, referring Plaintiff to the chronic care clinic for his asthma and high blood pressure conditions. *See* Doc. No. 57-2 at 52. At that time, Plaintiff was educated on the procedures regarding accessing health care treatment within the correctional facility. *See* Doc. No. 57-2 at 52. Prescription verification was carried out and revealed Plaintiff was

only taking medications for pain and was not taking medications for his high blood pressure, thyroid condition, or asthma. *See* Doc. No. 57-3 at 98-99.

A complete history and physical exam was completed on Plaintiff on February 12, 2007. *See* Doc. No. 57-2 at 53. At this time, Plaintiff reported a history of problems with his left ear and noted the 2006 car accident and subsequent hospitalization. *Id*. He also reported a history of mental health treatment at Circles of Care. *Id*. He specifically reported no current complaints and no current injuries. *Id*.

During his 2007 incarceration at the BCDC, Plaintiff submitted over forty Inmate Health Service Request forms. *See* Doc. Nos. 57-2 at 82-101, 57-3 at 1-24. Plaintiff's requests ranged from requests for pain medications to requests for evaluations by specialists for his hearing and vision. *Id*. Additionally, Plaintiff submitted medical grievance forms on March 7, April 1, April 26, May 5, and August 5. *See* Doc. Nos. 58-11 at 18-19, 58-12 at 1-2, 19. According to Plaintiff's inmate medical file, he was seen and/or treated by medical staff at the jail on the following dates during his 2007 incarceration: January 6, 18; February 12, 15, 28; March 6, 13, 15, 16, 17, 18, 19, 20, 22, 23, 28, 29, 31; April 1, 2, 6, 7, 8, 9, 10, 13, 14, 15, 16, 20, 21, 22, 23, 24, 27; May 12, 13, 17, 23, 26, 28, 30, 31; June 2, 8, 26; July 11, 15, 26, 30; August 5, 9, 10, 15, 23, 27, 28; September 15, 16, 17, 18, 19, 23, 25; October 10, 11. *See* Doc. Nos. 58-10 at 14-20, 58-11 at 1-20, 58-12 at 1-20, 58-13 at 1-20, 58-14 at 1-20, 58-15 at 1-20, 58-16 at 1-10.

Plaintiff was evaluated by Defendant Tite on July 30, 2007, after complaining of loss of hearing. *See* Doc. No. 57-2 at 71. Ophthalmology and ENT consults were ordered. *Id*.

5

An ophthalmology consult was conducted on August 10, 2007, and Plaintiff's vision was noted as stable. *Id*. He received a new prescription for glasses. *Id*.

Plaintiff was evaluated by Defendant Tite on a second occasion on August 15, 2007. *See* Doc. No. 57-2 at 70. At this time, he reported that his ear had "popped," a large clump of wax came out, and his hearing was back. *Id*. Examination revealed that the ear tube in Plaintiff's right ear was intact and the ear was stable. *Id*. An ENT consult was again ordered. *Id*. Defendant Tite evaluated Plaintiff again on August 28, 2007, at which time the right ear tube remained intact and he was provided medications for congestion. *Id*.

According to medication administration records in Plaintiff's medical file, Plaintiff was administered medications for pain, high blood pressure, and asthma throughout his incarceration in 2007. *See* 57-3 at 36-60.

## C.    *Incarceration at BCDC from January 8, 2008, through March 30, 2008*

Plaintiff was transferred from Tomoka Correctional Institute to the BCDC on January 8, 2008, and remained through March 30, 2008. *See* Doc. No. 57-2 at 3. The Department of Corrections Health Information/Transfer Summary notes that Plaintiff had no current medical problems. *See* Doc. No. 57-2 at 7. History of Plaintiff's 2006 car accident and his back problems were reported. *Id*. He was receiving medications for high blood pressure, asthma, pain, and sleep. *Id*. An intake medical screening was performed by jail medical personnel on January 8, 2008, at which time Plaintiff reported a history of hip, back, and right wrist pain. *See* Doc. No. 57-2 at 9-10. He was provided crutches and placed in general population in a lower bunk. *Id*. A health assessment was performed on January

6

23, 2008, at which time Plaintiff reported that he wore glasses for his vision but denied any problems with his hearing. See Doc. No. 57-2 at 11-12.

During his incarceration from January 8, 2008, through March 30, 2008, Plaintiff submitted three sick call request forms on February 16, March 4, and March 9. See Doc. No. 57-2 at 44-46.

In response to Plaintiff's February 16, 2008, sick call request, he was evaluated in the chronic care clinic on February 19, 2008. See Doc. No. 57-2 at 26. Plaintiff had undergone laboratory studies which were noted to be "great." Id. He was noted to have nasal congestion and muscle pains and received appropriate medications. Id. An EKG was also completed and was normal. Id. In response to Plaintiff's March 4, 2008, sick call request regarding the need for pain medication and complaints of a cold, he was evaluated by nursing staff on March 5, 2008, and given appropriate medication. See Doc. No. 57-2 at 45. In response to Plaintiff's March 9, 2008, sick call request, he was evaluated by nursing staff on March 10, 2008. See Doc. No. 57-2 at 24. Plaintiff complained of problems with his eyes, ears, and nose, and was referred to the medical doctor or physician's assistant. Id. Plaintiff underwent a complete physical on March 12, 2008, and was assessed with sinusitis. See Doc. No. 57-2 at 23. He received medications including antibiotics, decongestants, and nasal spray. Id.

### *Summary Judgment Standard*

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment shall be granted if it appears that there exists "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The burden of establishing that

there is no genuine issue of material fact lies on the moving party, and it is a stringent one. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Rule 56(e) further provides as follows:

> When a motion for summary judgment is made and supported as provided on this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or otherwise as provided in this rule, must set forth specific facts showing there is a genuine issue of fact for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Essentially, the nonmoving party, so long as that party has had an ample opportunity to conduct discovery, must come forward with affirmative evidence to support its claim. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986). "A mere `scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990). If, after the movant makes its showing, the nonmoving party brings forth evidence in support of its position on an issue for which it bears the burden of proof at trial that "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-250 (citations omitted).

### *The Law*

A plaintiff states a cognizable claim for relief under § 1983 if his complaint alleges facts showing that a person acting under color of state law has engaged in conduct violative of a right, privilege, or immunity secured by the United States Constitution. 42 U.S.C. § 1983. Although Plaintiff admits that he was provided with some medication while at the BCDC, he contends that Defendants failed to provide him with surgery or the correct treatment for his hearing loss, vision, and nasal congestion. He further asserts that

Defendants failed to provide him with necessary rehabilitative treatment for his leg, hip, wrist, and face.

To establish liability under § 1983 for inadequate medical treatment, a plaintiff must show that the failure to provide medical care amounted to cruel and unusual punishment under the Eighth Amendment to the United States Constitution.[4] To rise to this level, a plaintiff must show that his inadequate care arose from a "deliberate indifference to [his] serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976). This requires the plaintiff to satisfy both an objective and a subjective inquiry. First, the plaintiff must prove an objectively serious medical need "that, if left unattended, poses a substantial risk of serious harm." *Id*. The Eleventh Circuit has described a serious medical need as "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187 (11th Cir. 1994) (internal quotations and citations omitted). Additionally, a serious medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain. *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992). Second, the plaintiff must prove that the defendant acted with deliberate indifference to that need. *See Estelle*, 429 U.S. at 105-06. To establish deliberate indifference a plaintiff must

---

[4] Because Plaintiff was a pre-trial detainee from January 6, 2007, through October 10, 2007, his claim must be analyzed under the Fourteenth Amendment, rather than the Eighth Amendment. *See Bell v. Wolfish*, 441 U.S. 520, 535 (1979). However, "in regard to providing pretrial detainees with such basic necessities as food, living space, and medical care the minimum standard allowed by the due process clause is the same as that allowed by the [E]ighth [A]mendment for convicted persons." *Hamm v. DeKalb County*, 774 F.2d 1567, 1574 (11th Cir. 1985).

demonstrate that the defendant (1) had subjective knowledge of a risk of serious harm; (2) disregarded that risk; and (3) his conduct was more than mere negligence. *See McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999).

### *Discussion*

#### A. Liability of Defendants In Their Official Capacities

The Court notes that Plaintiff has not designated the capacity in which he is suing Defendants, and, therefore, the Court must assume that the suit has been brought against Defendants in their official capacities. *See Soper ex rel. Soper v. Hoben*, 195 F.3d 845, 853 (6th Cir. 1999) ("Generally, plaintiffs must designate in which capacity they are suing defendants; if not by operation of law, defendants are deemed sued in their official capacities."); *Wilbert v. City of Chicago*, 768 F. Supp. 253, 255 (N.D. Ill. 1991) (finding that, when the plaintiff failed to designate the capacity in which she sued two city police officers, the court was required to assume that the suit had been brought against the police officers in their official capacities).

A suit against a party in his or her official capacity is the same as a suit against the governmental entity that the individual employee represents. *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). Governmental entities may be liable when the alleged constitutional violations resulted from the execution of the policy or custom of the governmental entity. *See Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978); *Aspinwall v. Herrin*, 879 F. Supp. 1227 (S.D. Ga. 1994). Plaintiff has not come forward with any evidence that the governmental entity that Defendants represent had a custom

or policy which resulted in the wrongs asserted in the complaint. Thus, to the extent Defendants are sued in their official capacities, they are entitled to summary judgment.

### B. Liability of Defendants In Their Individual Capacities

An examination of the complaint reveals that the suit may have been brought against Defendants in their individual capacities; consequently, in an abundance of caution, the Court will determine whether Defendants are liable in their individual capacities. *See Biggs v. Meadows*, 66 F.3d 56, 60 (4th Cir. 1995) (when a plaintiff does not allege capacity specifically, the Court must examine the nature of the plaintiff's claims, the relief sought, and the course of proceedings).

#### 1. Liability of Brevard County Sheriff Jack Parker

None of the allegations in the amended complaint refer to any personal involvement by Defendant Jack Parker, nor does the amended complaint state that Defendant Jack Parker had knowledge of the challenged matters. Plaintiff has failed to allege or otherwise indicate any personal action or inaction by Defendant Jack Parker whatsoever within the scope of his responsibilities that would make him personally liable for damages under section 1983. Any conceivable liability on the part of Defendant Jack Parker would be based on the doctrine of *respondeat superior*, which has been rejected as a theory of recovery under section 1983. *Polk County v. Dodson*, 454 U.S. 312, 325 (1981); *Fundiller v. City of Cooper City*, 777 F.2d 1436, 1443 (11th Cir. 1985). Thus, summary judgment must be entered in favor of Defendant Jack Parker in his individual capacity.

### 2. Liability of Defendant Jennifer Tite

Although Plaintiff alleges that he had serious health needs, there is no indication that Defendant Tite ignored or abused Plaintiff or manifested deliberate indifference toward him.

Upon review of the record, it appears that Defendant Tite personally evaluated Plaintiff on only three occasions. Defendant Tite first saw Plaintiff on July 30, 2007, when he was evaluated as a result of a complaint of loss of hearing. Ophthalmology and ENT consults were ordered. An ophthalmology consult was carried out on August 10, 2007, and Plaintiff's vision was noted to be stable. He received a new prescription for glasses. Plaintiff was again evaluated by Defendant Tite for his hearing on August 15, 2007. It was noted that Plaintiff's ear had "popped" prior to the visit and his hearing had returned. Further, it was noted that Plaintiff's last ENT visit was in October, 2006, and an ENT consult was again ordered. Finally, on August 28, 2007, Defendant Tite's examination revealed that Plaintiff's ear tube in the right ear was intact, and she provided Plaintiff with medications for his congestion.

In support of her motion for summary judgment, Defendant Tite submitted an affidavit of Dr. Steven E. Shelton, a board certified family physician and expert in correctional care. (Doc. No. 57-5.) Dr. Shelton reviewed Plaintiff's medical records from his multiple incarcerations in the BCDC, records from Holmes Regional Medical Center and Omni Healthcare regarding Plaintiff's 2006 hospitalization and follow-up care, and Plaintiff's amended complaint. *Id*. at 1-2. Dr. Shelton attests as follows:

> Health care records document that Mr. Williams had easy and frequent access to medical and mental health care. His health requests (hearing, vision, and congestion) and his chronic conditions (asthma,

12

> hypertension, chronic pain) were evaluated, attended, monitored, and treated appropriately.
>
> When Mr. Williams complained of concerns and worries of vision change (7/25/07) and difficulty he had a timely evaluation done by PA Tite, and timely referral to ophthalmology. Ophthalmology updated his eyeglass prescription, and suggested "no treatment for cataract necessary at this time, re-evaluate in 6 months." Clearly PA Tite met community standards for care.
>
> Mr. Williams had decreased (essentially no) hearing out of one ear (left) since his MVA in 2006. Evaluation show a non-progressive, condition probably disruption of the ear bone chain. Repair would be entirely elective. Many individuals have hearing loss in one ear and function fine during life. Mr. Williams appears to be well functional with the good hearing in his right ear. Mr. Williams noted increased difficulty with hearing (7/25/07) he had a timely evaluation by PA Tite who noted no acute problem and a timely referral to ENT, and a follow up visit 8/15/07 at which Mr. Williams noted his ear had popped and hearing was baseline again. Clearly PA Tite met community standards for care. It is my opinion that community and correctional standards do not demand that Brevard Co. Jail offer surgical repair of the incus bone, especially due to the non-destructive nature of the condition, the non-progressive nature, and the relatively short and unpredictable time of incarceration.
>
> Mr. Williams may disagree with the amount or type of pain medication he desired, however, that is a disagreement between patient and physician. The pain medication ordered is an appropriate pain management medication and in my opinion in this given case by review of the records an appropriate choice. Medication administration records document that Mr. Williams was ordered and receiving medications for pain, high blood pressure and asthma throughout his incarceration in 2007.

*Id*. at 10-11.

Plaintiff's medical records reveal that he received consistent and extensive medical treatment while at the BCDC. Plaintiff wrote numerous sick call requests, and each was followed up in a timely manner by jail medical personnel. Plaintiff was seen on numerous occasions by medical personnel, who prescribed medication, ordered lab tests, and monitored his overall improvement. In fact, it appears that the only real treatment Plaintiff desired was surgery. However, a prisoner is not entitled to have the medical treatment of

13

his choice. *Jackson v. Fair*, 846 F.2d 811, 817 (1st Cir. 1988) ("Although the Constitution does require that prisoners be provided with a certain minimum level of medical treatment, it does not guarantee to a prisoner the treatment of his choice."). If the treatment given provides some measure of reasonable care, the fact that the prisoner might prefer a different treatment does not give rise to a constitutional violation. *See Hamm*, 774 F.2d at 1575 ("Although Hamm may have desired different modes of treatment, the care the jail provided did not amount to deliberate indifference."); *see also Johnson v. Doughty*, 433 F.3d 1001, 1014-15 (7th Cir. 2006) (decision of prison medical officials to use non-surgical means of treating hernia, even when cost is a factor in making treatment decision, does not constitute deliberate indifference).

At best, Plaintiff has demonstrated a difference in medical opinion between the medical personnel at BCDC and himself as to the course of treatment, which does not support a claim of deliberate indifference. *See Estelle*, 429 U.S. at 107 (matters of medical judgment do not give rise to a § 1983 claim); *Ledoux v. Davies*, 961 F.2d 1536 (10th Cir. 1992) (inmate's belief that he needed additional medication other than that prescribed by treating physician was insufficient to establish a constitutional violation); *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980) (difference in opinion between inmate and prison medical staff regarding treatment or diagnosis does not itself state a constitutional violation); *Murrell v. Bennett*, 615 F.2d 306, 310 n.4 (5th Cir. 1980) (Actions or inactions involving medical treatment violate the Eighth Amendment only if they involve "something more than a medical judgment call, an accident, or an inadvertent failure.").

There is simply no objective evidence showing that Defendant Tite's decisions concerning Plaintiff's medical care were based on or influenced by deliberate indifference to Plaintiff's well-being. As such, the Court concludes that Defendant Tite is entitled to summary judgment on Plaintiff's claims.

## C. Request for Injunctive Relief

The Court notes that Plaintiff is also seeking injunctive relief in addition to monetary damages.[5] However, Plaintiff is no longer incarcerated in the BCDC. Instead, he is currently in custody of the Florida Department of Corrections and housed at Tomoka Correctional Institute. Since Plaintiff has been transferred, his claims for injunctive relief are moot. *See McKinnon v. Talladega County*, 745 F.2d 1360, 1363 (11th Cir. 1984) ("The general rule is that a prisoner's transfer or release from a jail moots his individual claim for declaratory or injunctive relief."); *see also Spears v. Thigpen*, 846 F.2d 1327, 1328 (11th Cir. 1988) (finding that the plaintiff's claims for injunctive and declaratory relief regarding the conditions at the prison were moot since the plaintiff was transferred to another facility shortly after the complaint was filed); *Zatler v. Wainwright*, 802 F.2d 397, 399 (11th Cir. 1986) (affirming the dismissal of an inmate's request for injunctive relief as moot because at the time the district court rendered its decision, the inmate was no longer incarcerated at the prison where the alleged constitutional deprivation occurred).

---

[5] In the Relief Requested section of Plaintiff's Amended Civil Rights Complaint, Plaintiff states, "I would like surgerys [sic] done, the treatment, the right medication needed, the recovery plain [sic] and whats [sic] needed to help me. The pain and suffering that these months are bring [sic] to be pay [sic] for this also." (Doc. No. 7 at 10.)

15

### D. Defendant Brevard County Sheriff Jack Parker's State Law Counterclaim

Defendant Jack Parker seeks to recover liquidated damages for the cost of Plaintiff's incarceration pursuant to §§ 960.293 and 960.297, Florida Statutes (2009). With regard to this state law claim, the Court notes that "state claims should ordinarily be dismissed if all federal claims are eliminated before trial." *Edwards v. Okaloosa County*, 5 F.3d 1431, 1433 (11th Cir. 1993). Because Defendant Jack Parker's motion for summary judgment is meritorious and he is entitled to dismissal from this case, this Court declines to exercise supplemental jurisdiction over his counterclaim for liquidated damages for the cost of Plaintiff's incarceration. *See Scarfo v. Ginsberg*, 175 F.3d 957, 962 (11th Cir. 1999).

### *Conclusion*

The Court finds that Defendants Jennifer Tite and Brevard County Sheriff Jack Parker are entitled to summary judgment as a matter of law on Plaintiff's claims.

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. Defendants' Motions for Summary Judgment (Doc. Nos. 57, 58) are **GRANTED**, and Defendants entitled to summary judgment as a matter of law on Plaintiff's claims.

2. Defendant Brevard County Sheriff Jack Parker's Counterclaim is **DISMISSED** without prejudice.

3. Plaintiff's Motion for Summary Judgment (Doc. No. 64) is **DENIED**.

4. The Clerk of the Court is directed to enter a judgment in favor of Defendants and against Plaintiff.

5. The Clerk of the Court is directed to close this case.

**DONE AND ORDERED** in Orlando, Florida, this 7th day of July 2009.

MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE

Copies to:
pslc 6/16
Counsel of Record
Jimmie E. Williams